Good morning, Your Honors. May it please the Court, Brian King is my name. I'm representing the plaintiffs in this case. This is a case that involves treatment of a young woman at a residential treatment center. This young woman had serious mental health and substance use disorder problems. I won't recount either in summary or detail because the briefing contains it, but this is a very troubled young woman. She had struggled with issues involving, as I say, both mental health and substance use disorder for months before she was admitted and treated at Eva Carlston Academy in Salt Lake City. Premera is the third-party administrator of the self-funded plan that provides health benefits for this family, and they denied coverage based on a lack of medical necessity, their allegation that the treatment at Eva Carlston. The threshold issue we have is whether or not we review their determination and interpretation of the standards for abuse of discretion. Yes. What's your position on that? Our position is that we believe that there are procedural irregularities that exist that could cause the court to say, we're going to do de novo. But for purposes of the case and before the district court and before this court, we have agreed to an abuse of discretion standard of review. And that's important, Your Honor, as you point out, because one of the things that we're looking at, when you have deference that is granted to plan administrators such as Premera, it becomes all the more important that the procedural guarantees of ERISA's claim procedure regulations are honored. If the Federal judiciary, as it can and should, defers, they've got to make sure that at the very least those procedural guarantees are followed, that there is a full and fair review provided, that there is a meaningful dialogue that is engaged in. And the Ninth Circuit's been very clear on that, as have other courts across the country. And what we see is an increasing trend toward, in these particular cases involving residential treatment centers providing mental health and substance use disorder care, the circuits, the Tenth Circuit is one, the Ninth Circuit has this case, but there have been other cases where they've decided, you've got to engage in a meaningful dialogue. And if you have information that is presented to you and you're a third-party administrator, an appeal letter that goes into detail in the medical records about why the treatment was medically necessary, as the third-party administrator of the insurance company has to come back and talk in a meaningful, frank way with the family, with the petitioner, the claimant, about why it is that their appeal letter doesn't work. And that's especially important here, because what we see in the appeal letter, the letters that were submitted in this case, Your Honors, is that the individuals who were treating this young woman and who wrote letters of medical necessity said to Primera over and over again, if you have any questions, please reach out and let us know. Talk to us. Even if there's a procedural issue, ultimately there'd have to be some showing of prejudice. So ultimately this case comes down to whether they properly used the inter-qual criteria and then whether they properly assessed that she didn't meet the criteria. And so what, can you address those issues? What I would say about that, Judge Collins, is I would look at that and say, we did make clear, and the medical records make clear, on undisputed facts, that we satisfied, first and foremost, the inter-qual criteria. Now we have some qualms about whether the inter-qual criteria puts a gloss on the language of the plan itself that defines medical necessity. That is improper. And we say, and said to the district court, and we said in the pre-litigation appeal process, it's the terms, the language of the plan, and the medical necessity definition of the plan that guides you and has to dictate what the result is. They use the inter-qual guideline, Primera uses the inter-qual guidelines, to then put some more definition and meaning to the more general language of the plan document. I don't know that on the facts of this case that's dispositive at all. I don't have a problem with it. I kind of do. But the fact is, the information that was presented by the family, the undisputed information, shows that at least some of the inter-qual criteria, this young woman's condition satisfied in terms of her symptomology, and yet Primera never responded to us. They never came back and said, no, you're wrong, and here's why. They provided the most conclusory language. And what you see other courts saying, the Tenth Circuit is one in the DK and the David P. in the E&C case, but most recently, as our 28J letter pointed out from earlier this week, the Fifth Circuit in the Dwyer case says, yes, this kind of conclusory, these kind of statements from third-party administrators and insurers that don't come to grips with the undisputed information in the medical records about the patient's condition, that's problematic as a matter of process. But as you point out, Judge Collins, it also goes to the question of a substantive error in whether denied benefits were denied when they should have been granted. So there's a melding of the process and the substance here. I don't have a qualm with the idea that, you know, if you just come in, if I as a plaintiff's lawyer just came in and said, hey, the process wasn't followed, and you look at it and say, yeah, but there's no reason to think that the substance of the decision was in error at all, that's a hard case for me. I don't think that there should be a remedy for procedural violations when there's no reason to think that substantively there was a wrongful denial of benefits. But what we've got here is both these things, and they combine in a way that really creates problems for, in this case, Primera and the plan. So if, in fact, Primera had engaged in a meaningful dialogue in saying, we need X, Y, and Z information, what would you have provided? That's not in the record now. Right. Well, we would have gone back and had letters of medical necessity supplemented. So the providers would have been able to say, you say that this child needs to have X, Y, and Z kind of components under the interqual criteria, and we can show you that, in fact, those things existed. So there would be a more meaningful dialogue, a specificity to a second-level appeal letter from the family and from the providers of the care to say, you say, this is what interqual requires, well, we can show that. Or interqual, we've looked at interqual, and it doesn't just require those things, it requires, it says it's medically necessary if there are other things that happen. Let me make sure I understand your answer. What you are saying is, we would have gone back and gotten additional records. You don't have any records now that you would have submitted in addition. Not in addition, because the only records that we have are the records from Eva Carlson Academy. We would have been in a position to more intelligently and persuasively present information to Primera to say, the things that you're saying interqual requires, in fact, did exist in the records. So when you have just these conclusory statements from an insurance company to say, we don't think it's medically necessary, we think you could have been safely and effectively treated at a lower level of care, but they never tell you why they're ignoring the plain information, the explicit, quite detailed information, either the medical records or in the letters of medical necessity or in the appeal letters themselves. Sometimes the family provides additional information in the appeal letters that's not found either in the medical records or the letters of medical necessity that inform and enlighten, provide information to Primera. We didn't have any kind of a meaningful dialogue in that way. And that's the problem. So again, what we would come back to and say, Your Honors, is, especially under an abusive discretion standard of review, this Court must be satisfied that a meaningful dialogue took place, that there was a full and fair review as required by the explicit language of ERISA. We just don't have that here. Counsel, if I can jump in, I just have a couple of procedural questions just to understand how we frame this issue in this case. So the initial denial, as I understand it, was on November 8th of 2017. Then there's a reference to some further reviews that the insurance company did, Dr. Ali's letter, which was in, I believe, July of 2018. And then there's MetHealth has their own analysis in January of 2019. Now, those came long after the initial denial. So I'm trying to understand, I'm asking the same question. At the end of the day, on the one hand, you could say, Well, it's really relevant that these two independent doctors said that this claim should not be honored. But it also came long after the initial denial. So I'm trying to understand, is that something we do consider when we review the initial denial, or is it just irrelevant because it wasn't before the insurance company in November of 2017? Right. It's a good question, Judge Owens. Here's the thing that ERISA requires. It requires a pre-litigation appeal process that is meaningful so that parties can resolve their differences before they have to make a decision about whether they need to go to federal court. That pre-litigation appeal process is an evolving process. It contemplates that there will be a dialogue, as the phrase uses that word, that there will be a back and forth exchange. Information will be provided. Responses will be given. Follow-up information will be provided. The KD case, Judge Jenkins out of Utah from 2023, has a nice comment about how that process looks, works, and what it should look like. So what we've got here is information that up until the point of litigation commencing, we think our position is that that is part of the pre-litigation appeal process. That is fair game for a district court or the circuit court to consider as to whether there was, in fact, a full and fair review, as to whether there was, in fact, a meaningful dialogue that came to grips, comes to grips with the information that the parties are exchanging. And then the next question I have, which is different, is so the care that you want your client to have was a certain amount of money. The insurance company thought it should be a lesser amount. What happened to the situation? Did they have to make up the difference? Like, let's assume, just so I understand the math, let's just say we think that they're right, which I'm not saying, but they still would owe your client something. Yeah. Is there a process for your client to at least get whatever they thought should have happened? Is there a way for your client at least to get that money? Not. No. The answer to the question is no. I hear what you're saying, Judge, is, well, listen, they acknowledged that at least outpatient treatment was medically necessary, and so they should have paid. Instead of the full rate of treatment at Eva Carlson, they should have paid 15 or 20 percent of that through a flick. No. It's all or nothing in this case. Now, the family has gone ahead, as you know, the family decided that it was necessary to treat this young woman at Eva Carlson, and they made arrangements and came up with the funds to have her treated. So if this Court chose to remand the case, and you see the Tenth Circuit in the D.K. case and then in the David P. case, in the D.K. case they affirmed the district court's decision to not just reverse the denial, but to order payment of benefits. In the David P. case, they reversed a portion of the district court ruling and said, we're going to affirm that the denial of benefits was wrongful, but we're going to reverse the district court's order that benefits be paid, and we're going to remand the case back to the insurance company for an evaluation of what should be — whether the benefits should be paid. But that's a different question than you're asking. There's nothing that I'm aware of that requires Primera to pay benefits at the outpatient level. What they would have paid. I mean, what they would have paid. Yes. There's nothing that I'm aware of. And I'll reserve the remainder of my time. Very well. Thank you. Thank you, Your Honors. My name is Gwendolyn Payton, and I represent Primera Blue Cross and Columbia Banking Systems Benefit Plan. With me is Melissa Anderson from Primera. This case is about the confinement of a child in a residential treatment center, which is a 24-7 lockdown facility. It's a significant moment in the life of the child. The child is away from community, from family, from peers, from friends, from school. And the issue here is, was it medically necessary for IB at the time of admission and during her stay there? To answer Your Honor's question about, is it — is this about paying less money? No. It's about paying for the right level of care, because just like hospitalization, we don't want people in the hospital when they don't need to be there. That's unhealthy. And we don't want a child confined when she doesn't need to be confined. Had the facility submitted the claims for therapy, which were covered, it would have paid. What's at issue in this case is the room, board, and tuition of the academy. Those things were not medically necessary. And what the plaintiffs want is this court to order payment of that room, board, and tuition through 12 months — Following up on Judge Owen's questions earlier, presumably as part of the program at the residential treatment center, she did receive counseling and therapy and, you know, possibly other assistance. Were those services paid for by Primera? If they had been submitted correctly as claims, they would have paid. But what was — Even though they took place at Eva Carlson? Yes. For example, we often see therapy provided in schools, in public schools and otherwise, and those claims pay. But what isn't paid is the tuition to go to school. And that wasn't medical care. And you see that in terms of what the facility is actually providing. The facility didn't do what InterQual requires for a residential treatment center. There needs to be a psychiatric evaluation upon intake within 24 hours. That did not happen. The child needs to see the psychiatrist at least once a week. And this is common sense. On this once-a-week issue, that's mentioned at the first level explanation. But maybe I'm reading it wrong, and you'll correct me if I am, but it seemed to drop out when it goes up the level of appeals and that, you know, only the ground that, you know, she had done well at Wilderness and could have been treated in the community, that's mentioned at the higher levels. But the not seeing the psychiatrist every week or whatever, that dropped out. Am I reading that wrong? You're reading it right, Your Honor, and let me tell you... But then, doesn't that mean you forfeited that rationale? No. And here's... Because you had it at the bottom, and then as they went up the appeal, you dropped that and had the others. So why isn't the right answer we just set that aside? The right answer is you consider it because you look at the course of the ERISA appeal process. And I want to walk you through that and answer that question. It also answers the question that Your Honor had about how does this work, and why is the temporal quality of it, and what do you consider? And those answers are together. So the claim comes in, and it's already the child has been confined in this treatment center for seven months by the time the claim comes. At that point, Primera says you're not at the level of severity to be confined, and also they're not doing the things that they need to do to be a medical facility. And that's the issue, Your Honor, you're raising about the psychiatric evals on intake and carrying off. They say at that point, family, if you disagree and you think we've got this wrong, let us know. You can appeal, and you can submit anything that you want. And you can have doctors talk to us. They did that. And in responding to the Level I appeal, what the family says, and you really should look at that letter, it's 226 in the record. They write a lengthy and very thoughtful letter with a lot of history of the child. And that answers the question Your Honor was asking is what else would they have said, right? Well, the question I have, because I look at the denial letters, and they basically say if you have other information, send it to us. But it really doesn't, Primera really didn't communicate this is what we need. It just said send us information, and they did. But the argument, the level of specificity you're arguing today in the briefs, I see is not present in the letters. At least that's the way I read them. I disagree. And that's the question. My question is whether Primera really engaged in a meaningful dialogue about what was necessary. Well, they tell them, first of all, they tell them a lot of information. They tell them the plan part that they're relying on. That's a medical necessity definition. And they say these are the interqual guidelines, and they have that. And here are all of the issues that we would expect to see for residential treatment. If you think there is evidence of that, you can submit that. And it's very clear what the requirements are. And that's what ERISA requires. But what I don't see is we reject your submissions because, and we need something else. What they say is you didn't meet these criteria. Here's the criteria. If you have information that you think meets this requirement, then you can submit it to us, including expert opinions, including treating providers, whatever you think you need to show us. And what you would expect in this case, Your Honor, in cases like this, would be a psychiatric evaluation that shows that the child is at the level of severity, needs to be taken out of the community, and we don't have that there in this case. Yeah, and so when did you tell? Over and over. No, I mean, you gave the general criteria, but you did, as far as I can tell, in the letters, you did not specify that with the level of specificity you're giving us today. I know what you think, you said. But the letters are just saying that wasn't enough. Send us more if you have anything. Well, this is what ERISA requires. You have to tell the member why you are saying no. And they do that with quite a bit of specificity. And then if there is something else out there that goes to the issue of why you're saying no, and that gets to the next point of when the family responds with the level one appeal, they never raise the issue of the psychiatric evaluation. It is not in that letter. And what PRIMERA then does in response to the level one appeal is they send it to an independent child and adolescent psychiatrist who does an independent evaluation. And at that point, they respond to the family's concerns. And nowhere in there is that psychiatric level of frequency of visit raised again. And what ERISA, in every single case, you cannot find any authority to the contrary, says is that you respond to what the member is saying. You do not have to shadow box. You in the first one had these multiple grounds. And then in the appeal, they didn't challenge that particular ground. So that's why it's never mentioned again. That is correct. They are responding to the family's arguments. Why wouldn't you point out in the letter, you know, we gave an adequate and independent alternative ground that you haven't even challenged. And so what is your response? That's never even told to them. Now you're saying basically the whole appeal was pointless because there was a ground that was unchallenged that was sufficient alone to deny it. I think, I don't, I wouldn't call it pointless. I think that what we see in this case is the ample amount of due process that an ERISA beneficiary is entitled to under ERISA. And there's a reason that we have this, right? We want quick, efficient claims adjudication. This is what Congress has told us we must do. But there's tradeoffs, right? That's why we see in ERISA there's no jury trial. There's no, there's no discovery. You're limited to the administrative record. But what they, what fair and full review says is you address what they want to talk about and you, and you address it. What you don't have to do is continue to do an array of issues that are no longer being contested or at issue. They had the right to do those appeals. They could put anything in the appeals that they wanted. They weren't, they didn't have to raise issues if they didn't think they were contestable. Like this one simply wasn't. But the, sorry to interrupt, but the regulations provide that you have to provide the claimant with the required information so that she could perfect her claim. And they do. What I see in the letters is a denial and then send us anything more you've got.  You didn't say we really need X if you're going to perfect the claim. Well, they sort of. We didn't need the psychiatric report. Yeah, they did at the beginning say there's no psychiatric report. Yeah. And it's in there. And then it dropped out. And look, either they send it or they don't, but they get all these layers of appeal. Then you see after the level one, they get the panel review. They do submit an additional letter at that point. And again, when you look at their submission, they're addressing many issues in their letter, but they're all really going to the issue of the history of the child, not the child at the time of admission, but just the difficulty that the child has endured through life. Then, and this is the most important part of the appeal when you're doing a, or a abuse of discretion review under the Affordable Care Act, it is mandated that the family is entitled to an independent review and that reviewer is selected by the insurance commissioner from the state of Washington, picks that reviewer. Again, we get an independent child and adolescent psychiatrist, looks at the whole thing, right, independently and says, no, this level of severity isn't enough for residential treatment at the time of admission and there on. At that point, nobody is contesting the fact that she wasn't receiving the level of medical care that you would need to have a child receive if you're going to be doing this level of confinement and the child cannot be safely treated in the community. And you see in those inter-call guidelines, there is a very strong statement that you want to get the child back into the community as fast as possible. This is a therapeutic boarding school. It may have been beneficial for the child during certain points, but it doesn't mean it's medical care under an ERISA plan. It is something different. What plaintiffs say is the problem with this whole appeal process is, of course, the issue we've been talking about, did Primera abandon or is that a shifting rationale? It is not, because you will see, for example, in the E.W. case out of the is an issue. The ERISA appeal process doesn't require you to address it over and over. And that makes sense. It would be inefficient. We don't want a process where we're trying to guess arguments that might be out there. What we're doing is having a meaningful dialogue with the family, addressing what they have raised in their appeal and what is concerning them. The other issue that they raise is that Primera ignored those provider letters. And I think the law is very clear at this point where we have a lot of robust case law about what to do with provider letters. They need to address the salient issue. I don't think that Primera ignored them, but they don't talk about that issue that needs to be addressed for medical coverage, which is, is there level-sufficient evidence that at the time of admission the child cannot be treated safely at a lower level of care? Again, that's not about paying less. That's about getting the right treatment at the right time in the life of the child. And there simply is nothing in any of those letters that goes to that issue. What there are are generalized references to the history of the child and the need for care, which is not contested here. It's just whether this room board intuition was something that needed to be covered. You see in this case a really robust due process given to the family. And what you will not see, Your Honor, is a failure to address the issue that the family raises at all four steps. Every time the family raises an issue, Primera responds to it. And the issue of allowing a robust, completely open, and you'll note in the record that the family could have appeared at the panel and talked. So all of this is taken into consideration. In all the ERISA regulations, we see that movement toward allowing people to submit what they want to submit, but no requirement that you respond to what they do not choose to submit during the administrative record. So the reason, Your Honor, that this record goes on for a while is because there are timelines under ERISA. The family can appeal within a very lengthy period of time post-denial. And they can, and so they submitted their claims whenever they, their appeals whenever. And Primera has a certain amount of statutory time to respond to those. And it extends out. However, the reviewers will look at everything that is submitted. So things at the time of admission, which are really the most salient, but also things that happen afterward because they are important. The issues about where the child was prior to admission, how the child was after admission. You can see that the child and adolescent psychiatrists do care about that. But the question is, at the time of admission, can she be treated at a lower level of intensity? And there is nothing in this record that would lead to the alternate conclusion. Again, we'd expect to see a comprehensive psychiatric exam upon admission. It's simply not there. It will never be there, of course. But the ERISA process was still wanting to engage with the family as they raised new issues. And things can change, right? Over 12 months, there may be something that happens that changes the level of severity, but that did not happen in this case. Under abuse of discretion, this Court should uphold the district court's finding and find that this claim was properly adjudicated and all of the procedural requirements under ERISA were done for this family. Thank you. Roberts. Thank you, counsel. We can round up to three. Thank you, Your Honors. I want to go back to this issue about the first denial letter raising the question about whether there was a psychological evaluation the first 24 hours, I think it was. But we did — that was in the first letter. And as you point out, Judge Collins, it was dropped from the second and third letters. And part of the reason we think it was dropped is because in the appeal letter, we did say, listen, the medical records show that the treatment generally and specifically for this young woman was medically necessary. And we are telling you that we have a problem with using anything other than the language of the plan itself that talks about what constitute medical necessity. There's nothing in the plan about this kind of really detailed, specific requirement of a psych eval happening in the first 24 hours. What happens is, at the facility, you see treatment being provided on a daily basis. My colleague — But just so I understand, your argument in that respect is that the — to the extent that that requirement is in the interqual criteria, that wasn't an appropriate criterion to bring in. But you didn't contest on the appeal from the first denial that that criterion was not met, if it was applicable. We contested — we stated in that initial appeal letter that the treatment was medically necessary, both under the language of the plan, and we talked about the criteria from interqual in that appeal letter and subsequent appeal letters being satisfied. We also said, as you point out, Your Honor, that the interqual criteria was unduly stringent, that it did not reflect generally accepted standards of medical practice. It's not necessary for this Court to reach that issue simply because the undisputed facts of the record show that the interqual criteria, in fact, was met. On this point, on the specific point about — But they weren't met on — in terms of having a validation of need on a, you know, weekly or whatever the — Well, they were not met in the sense that there wasn't a psych eval happening in the first day. But there was a psych eval, and Premier admits this, that there was a psych eval within 10 days after admission. I think if you go to page 211 of Volume III of the record, you'll see that. And then there was regular treatment being provided to this young woman on a — multiple times a week, many times, multiple times a day. So this was an intensive clinical environment. My colleague refers to it as a therapeutic boarding school. It's not a therapeutic boarding school. It's a licensed residential treatment center. Therapeutic boarding schools are licensed separately and differently in the State of  This is an example of a post hoc argument that's being presented, that, well, this is treatment that's provided in a setting other than residential treatment. It's just not accurate. We think that the E.W. case — we talked about this in our reply brief, Your Honors, that the E.W. case on which Premier relies on is distinguishable. I won't go through that. I'm out of time anyway. But we think, to conclude, that the Boutin, Salama — or Saloma, Safon, and Harlett cases from the Ninth Circuit, together with others that we cite from the Tenth and the Fifth Circuit, are most appropriate in terms of the lack of a meaningful dialogue here and justify reversal — require reversal of the district court decision. Thank you. Thank you very much, Counsel. Thank you to both of you for your briefing and argument in this case. Much appreciated. This matter is submitted and we'll move on to the final case for today.
judges: THOMAS, OWENS, COLLINS